Filed 12/10/25  In re Al.H. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Al.H. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>H.H.,<br><br>     Defendant and Appellant. | G065610<br><br>(Super. Ct. Nos. 20DP1181A, 20DP1182A, 20DP1183A, 25DP0131)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Affirmed in part and reversed in part. Request for judicial notice granted.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

H.H. (Mother) challenges the juvenile court's jurisdictional findings and disposition orders concerning her four children, Al.H. (born 2007), G.H. (born 2008), L.H. (born 2014), and Ai.H. (born 2023) (the children). The Orange County Social Services Agency (the Agency) initiated this child welfare proceeding after a domestic violence incident involving Mother, Ai.H.'s father (D.M.), and the two oldest children, which ended with D.M. stabbed multiple times.[1] The court asserted jurisdiction based on a history of domestic violence between Mother and the children's fathers, Mother's drug use, and Mother's mental health and criminal history, among other grounds. Citing the domestic violence risk, it declined to terminate jurisdiction and ordered services for Mother. Mother contends the evidence did not support any of the jurisdictional findings. Alternatively, she claims the court was required to terminate its jurisdiction at the disposition stage.

We conclude the evidence supports the jurisdictional findings based on domestic violence and Mother's drug use. We agree with Mother the evidence did not support jurisdiction based on her mental health and criminal history. But we conclude the juvenile court reasonably retained jurisdiction and would have done so even absent the infirm findings. Accordingly, we reverse the findings on Mother's mental health and criminal history but otherwise affirm.[2]

---

[1] The three older children share the same father, who is not D.M.

[2] Although neither father appealed, Mother purports to challenge various jurisdictional findings that concern only them. Because the disposition orders were not based on those findings and Mother cannot show they affect her rights, she lacks standing to challenge them. (*In re D.S.* (2007) 156 Cal.App.4th 671, 674 [parent has no standing to appeal absent impact on personal rights].) We do not discuss those challenges further.

FACTS

I.

PRIOR PROCEEDING AND D.M.'S STABBING

The three older children were previously declared dependents of the court because of their father's physical violence against Mother, both parents' drug use, Mother's adjustment disorder diagnosis, and Mother's criminal history. The juvenile court terminated jurisdiction in 2022. Mother and the children began living with D.M., who was employed; Mother was not.

The family returned to the Agency's attention in early February 2025, after D.M. was stabbed at the family home. L.H. called 911 reporting that Mother and D.M. were screaming and D.M. was being abusive. Responding officers found L.H. on the street, crying and "frantic." He directed them to the residence, where Mother was outside. When L.H. called out and ran toward her, Mother retreated into the garage and closed the door, leaving L.H. and the officers outside. An officer observed a fresh trail of blood on the driveway. Despite multiple requests by officers over the course of two hours, Mother refused to come out.

During that time, an officer tried to get more information about the incident from L.H., who "continued to get physically agitated and frantic." L.H. said he went outside while D.M. and Mother were arguing in the living room. According to him, he then saw Al.H. and G.H. enter the home—Al.H. was carrying a knife and G.H. was holding a small hatchet. L.H. heard yelling, commotion, and Mother shouting, "'Stop.'" That was when he ran to the street to call police.

L.H. recounted Mother and D.M. were "constantly fighting" and D.M. was abusive to Mother and had "hurt" her. He described prior incidents

of D.M.'s domestic violence, including one where D.M. swung a metal pipe and broke items in the home.

Meanwhile, officers at a local hospital contacted a male stabbing victim—later identified as D.M.—who was transported by a 17-year-old—later identified as Al.H. D.M. had multiple stab wounds to his abdomen and arm. He gave inconsistent accounts, ultimately claiming he had been stabbed by unknown assailants outside his garage. Al.H. said he had brought D.M. home from a bar, noticed he was bleeding, and took him to the hospital.

The Agency later interviewed Mother and the three older children about the incident. Mother denied any disturbance, professed ignorance about any reason for L.H.'s police call, and could not explain why Al.H. took D.M. to the hospital or why there was blood on the driveway.

Al.H. now claimed D.M. had come home from the bar on his own, and he noticed D.M. wounded near the garage. L.H. said he had called police because he was having a panic attack, variously claiming he thought his father had returned home or he thought D.M. was being abusive. He said he was "'forgetting'" whether there had been prior domestic violence between D.M. and Mother and explained the blood on the driveway as rodent blood.

G.H. denied any domestic violence and any knowledge of an altercation that night. He had two cuts on his right palm, which he said occurred during woodshop.

II.

CHILD WELFARE PETITION

The Agency filed a petition alleging, among other things, the children came within the juvenile court's jurisdiction under Welfare and

4

Institutions Code section 300, subdivision (b)(1) (failure to protect).[3] The petition cited the stabbing incident and D.M.'s domestic violence, prior domestic violence by the older children's father, and Mother's substance use.

The petition further alleged Mother "may have unresolved mental health issues," noting her prior diagnosis of adjustment disorder. And it listed Mother's criminal history, including arrests and convictions for violent and property offenses, the most recent of which was for an offense from 2017. The petition also recounted facts from the prior child welfare proceeding and included various other allegations concerning the fathers alone.

Pending the jurisdiction hearing, the juvenile court released the children to Mother's care. The court ordered Mother to ensure D.M. did not reside in the home, to participate in case plan services, and to submit to random drug testing. Mother only partially complied. She enrolled in parenting classes but did not participate in other case plan services, including counseling. She generally tested negative for drugs but had two missed tests.[4]

---

[3] Undesignated statutory references are to the Welfare and Institutions Code. The petition also asserted jurisdiction over G.H. and Ai.H. was appropriate under section 300, subdivision (j) (abuse or neglect of sibling). Because Mother asserts no independent challenge to findings based on this allegation, we do not address it further.

[4] Around the time of her missed tests, Mother claimed she was "having difficulty with testing as her code was not functioning." She later reported the issue had been resolved.

## III.

### JURISDICTION AND DISPOSITION HEARING

At the May 2025 jurisdiction and disposition hearing, Mother, Al.H., and L.H. testified. Each denied any domestic violence by D.M. All testified D.M. had not returned to the house since February, and Mother said their relationship ended at that time.

Regarding the stabbing, Mother denied L.H.'s prior statements to police. She testified that there had been no verbal altercation between her and D.M. and that she and the children were all inside or in the backyard when D.M. "was attacked outside of [the] garage." Both Al.H and L.H. testified they did not remember what happened, though they recalled hearing screaming while in the backyard. L.H. said he ran to the street and called 911, while Al.H. claimed he found D.M. bleeding by the garage and drove him to the hospital. G.H. did not testify.

A social worker testified there was no indication D.M. had returned to the home. The social worker also reported Mother had not participated in most of her case plan services. The juvenile court admitted the Agency's reports, which recounted the evidence concerning D.M.'s stabbing, including L.H.'s statements to police.

The court sustained all the petition's allegations and declared the children dependents of the court. It credited L.H.'s "spontaneous[]" and "detail[ed]" statements to police on the night of the incident, before family members could "get their stories aligned and minimize the situation." It noted that according to L.H., his brothers "retrieved a hatchet and a knife," that the "violent and abusive" D.M. was then stabbed six times and later

gave an "unconfirmed story" to police, and that G.H. had cuts on his palm. The court deemed D.M.'s violent conduct "a threat to everyone."

The juvenile court found a current risk to the children. It observed Mother had been in a violent relationship with the older children's father and then with D.M. It also questioned the credibility of testimony that D.M. had no more contact with the family: "[D.M.] was the breadwinner, and it's unclear how Mother now is able to support herself. She was relying on him. He's the father of her child. And he was living there . . . ."

At disposition, the court left the children in Mother's care and ordered family maintenance services. It declined to order a psychological evaluation for Mother, finding no evidence her prior diagnosis "has affected her parenting per se." Mother timely appealed.[5]

DISCUSSION

Mother challenges the sufficiency of the evidence supporting the jurisdictional findings. Alternatively, she contends the juvenile court was required to terminate jurisdiction at the disposition stage.

We conclude substantial evidence supports the findings based on domestic violence in the home and Mother's drug use. We agree that findings on Mother's mental health and criminal history were unsupported and should be reversed. But the record supported the juvenile court's decision to retain jurisdiction based on the domestic violence findings alone.

---

[5] While this appeal was pending, the juvenile court terminated jurisdiction over Al.H., who had turned 18. We grant the Agency's request for judicial notice of the court's order. The Agency contends the appeal as to Al.H. should be dismissed as moot. But even assuming the appeal is moot as to Al.H., we would exercise our discretion to consider it. (*In re D.P.* (2023) 14 Cal.5th 266, 282 [courts have discretion to reach merits despite mootness].)

# I.

## JURISDICTIONAL FINDINGS

*A. Section 300 and the Standard of Review*

Under section 300, subdivision (b), the juvenile court's jurisdiction extends to children who are at a substantial risk of suffering "serious physical harm" because of (1) a parent's failure to adequately protect them or (2) a parent's inability to provide regular care due to mental illness or substance use. (§ 300, subd. (b)(1)(A) & (D).) The question under section 300 is whether the risk exists at the time of the jurisdiction hearing. (*In re J.N.* (2021) 62 Cal.App.5th 767, 775.) The Agency must show how the minor has been or will be harmed. (*Ibid.*) And although evidence of past conduct may be probative of current conditions, the Agency must establish a nexus between that past conduct and the current risk of harm. (*Ibid.*)

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 22.) We view the evidence in the light most favorable to the court's order, drawing every reasonable inference and resolving all conflicts in support of its findings. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165.)

*B. Domestic Violence*

The record amply supports the juvenile court's findings on domestic violence in the home. In assessing the stabbing incident, the court reasonably credited L.H.'s excited and "detail[ed]" account over the family's later, inconsistent story about unknown assailants outside the home or at a bar. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 810 [nervous excitement inhibits reflection and is more likely to produce sincere expression of belief]; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [testimony of single witness

8

sufficient to support juvenile court's findings].) Under L.H.'s account, D.M. was again abusive toward Mother, and the older brothers intervened with weapons. By reasonable inference, this confrontation led to D.M.'s stabbing and G.H.'s injury.

Mother contends the "unknown assailants" explanation was more plausible. But that account conflicts with L.H.'s contemporaneous statements, which established a specific sequence: (1) Mother and D.M. arguing inside the home; (2) L.H. witnessing his brothers enter with a knife and hatchet; (3) shouting and commotion; and (4) L.H. running to call police. This sequence—occurring in a compressed timeframe while L.H. was at home—established D.M.'s stabbing was tied to a domestic altercation in the home, not a separate incident with unknown assailants outside.

Aside from the family members' evolving and inconsistent versions, no evidence suggested the presence of strangers at the scene. And Mother's refusal to come out of the house at the officers' requests further undermined the credibility of that story. In any case, it was for the juvenile court to decide which account was more probable and trustworthy. (*In re Marina S., supra*, 132 Cal.App.4th at p. 165) The court permissibly credited L.H.'s original account.[6]

---

[6] Mother asserts, without meaningful argument or citation to authority, that "one may question whether [L.H.'s] statements about [Mother] and [D.M.] arguing on prior occasions is really a 'spontaneous' or 'excited' utterance." But the record shows L.H. *was* excited when making those statements—he "continued to get physically agitated and frantic." To the extent Mother suggests L.H.'s statements were inadmissible hearsay, she is mistaken because they were properly admitted as part of the Agency's reports. (§ 355, subd. (b) [hearsay contained in agency reports admissible at jurisdictional hearing].)

The stabbing incident was not an isolated event but part of a continuing pattern of domestic violence. It is undisputed the children were previously exposed to serious domestic violence between Mother and the older children's father.[7] This exposure continued during Mother's relationship with D.M. According to L.H.'s original account, Mother and D.M. were "constantly fighting," D.M. was abusive to Mother and had "hurt" her, and he once broke items in the home with a metal pipe. The juvenile court reasonably concluded that D.M.'s conduct posed "a threat to everyone."

The evidence that severe domestic violence in the children's presence was an enduring feature of the family's life provided a proper basis for the court's exercise of jurisdiction. "It is well settled that physical violence between a child's parents may support the exercise of jurisdiction under subdivision (b)(1) of section 300 where there is evidence that the domestic violence has placed the child *at risk* of physical harm and the violence is ongoing or likely to recur." (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.) "'[D]omestic violence in the same household where children are living *is* neglect; it is a failure to protect [them] from the substantial risk of encountering the violence and suffering serious physical harm . . . from it.'" (*In re S.O.* (2002) 103 Cal.App.4th 453, 460–461.) The juvenile court properly asserted jurisdiction on this ground.

---

[7] Although Mother notes the older children's father had no contact with the family, his prior domestic violence shows Mother's pattern of tolerating abusive relationships, exposing the children to a significant risk of harm. Similarly, the child welfare petition's recounting of the facts underlying the prior proceeding was relevant to support the risk of harm from domestic violence and Mother's drug use, which we discuss below.

*C. Mother's Drug Use*

Substantial evidence also supports the findings on Mother's drug use. Mother had a history of drug use, which led to sustained allegations in the prior child welfare proceeding. Although she argues there was no evidence of recent use, the record reflects she missed two random drug tests during the current proceeding. The juvenile court was entitled to treat those missed tests as positive results, supporting a finding Mother continued to use drugs.[8] (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 [missed drug test may be treated as positive result].) Mother does not contend that, if supported, her continued drug use would be insufficient to support jurisdiction. Accordingly, substantial evidence supports the court's jurisdictional findings on Mother's drug use.

*D. Mother's Mental Health and Criminal History*

The record does not support juvenile court jurisdiction based on Mother's mental health and criminal history.[9] First, although Mother had a prior diagnosis of adjustment disorder, there was no evidence she continued to suffer from this condition or that it posed a current risk to the children. Indeed, the juvenile court here found the diagnosis had not affected her parenting and declined to order a psychological evaluation. The Agency does not defend the mental health finding on appeal.

---

[8] Mother reported technical difficulty with testing around the same time, but the juvenile court was not required to credit her account and attribute her missed tests to the claimed issue.

[9] The Agency maintains that Mother's challenges to these findings are moot given that jurisdiction was nevertheless proper on other grounds. We need not decide whether these challenges are moot because we would exercise our discretion to consider them regardless. (*In re D.P., supra*, 14 Cal.5th at p. 282.)

Second, although Mother's history of arrests and convictions included serious offenses, the most recent offense occurred in 2017, about eight years before the jurisdictional hearing. The Agency made no effort to tie its abstract listing of remote offenses to a concrete risk of harm to the children. (See *In re J.N. supra*, 62 Cal.App.5th at p. 775.) As with the mental health findings, the Agency does not defend the criminal-history findings on appeal. Accordingly, we reverse the findings concerning Mother's mental health and criminal history.

## II.

### DISPOSITION ORDERS

The record supports the juvenile court's decision to retain jurisdiction. "The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851.)

As discussed, the family had a significant history of domestic violence. This history culminated in an egregious incident shortly before the hearing, in which the children intervened to defend Mother, D.M. was stabbed multiple times, and G.H. was injured. After the incident, Mother refused to cooperate with police and locked L.H. out of the house. And family members offered a fabricated account of the incident. During this proceeding, Mother failed to participate in counseling, despite a court order requiring her to do so. These circumstances did not inspire confidence that court oversight was no longer necessary to protect the children.

Mother contends any risk of harm had dissipated because D.M. was no longer a part of the family's life. The juvenile court reasonably rejected this position. First, the circumstances did not suggest Mother had gained any insight about the risk abusive relationships posed to her children. After one abusive relationship led to child welfare findings, Mother entered and remained in another. And her repeated denial of D.M.'s abusive conduct suggested she still did not see it as a reason to break from him.

Second, only about three months had passed since the stabbing incident, and nothing suggested Mother's material circumstances had changed. As the juvenile court noted, D.M. had been the family's sole breadwinner and was Ai.H.'s father—two factors that could make it hard for Mother to permanently separate from him. (See *In re I.B.* (2020) 53 Cal.App.5th 133, 157 [financial dependence can make leaving abuser difficult]; Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome* (1993) 21 Hofstra L.Rev. 1191, 1234 [concern for their children may lead some women to stay in abusive relationships].) Under these circumstances, the court reasonably found D.M.'s temporary absence did not alleviate the risk of harm to the children.

Because the juvenile court expressly relied on the domestic violence findings alone in ordering continued jurisdiction, any infirmity in other findings does not affect its disposition orders. (See *In re Al.J.* (2019) 44 Cal.App.5th 652, 665 [to obtain reversal, appellant must show reasonable probability of more favorable outcome absent error].)

13

## DISPOSITION

The juvenile court's jurisdictional findings on Mother's mental health and criminal history are reversed. All other jurisdictional findings and the disposition orders are affirmed.


MOTOIKE, ACTING P. J.

WE CONCUR:


DELANEY, J.


SCOTT, J.